Filed 2/17/22  In re J.I. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re J.I., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E077837 |
| Plaintiff and Respondent, | (Super.Ct.No. J280937) |
| v. | OPINION |
| G.L., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. Erin K. Alexander, Judge. Affirmed.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Kaleigh Ragon, Deputy County Counsel, and Steven O'Neill, Interim County Counsel, for Plaintiff and Respondent.

1

G.L. (father) appeals the termination of his parental rights. (Welf. and Inst. Code, § 300, subds. (b) & (g), unlabeled statutory citations refer to this code.) He argues the court erred in deciding the beneficial parental relationship exception did not apply. We affirm.

I

FACTS

A. *Referral and Dependency Petition*

The subject of this dependency is father's now two-and-a-half-year-old daughter J.I. San Bernardino County Children and Family Services (department) began its investigation because both mother and daughter tested positive for methamphetamine at birth. Father said he was not aware mother used methamphetamine as he was out of the home often.

Father cares for and trains horses that compete in rodeos and races. He worked away from the home from 6:00 a.m. to 11:00 p.m. He also traveled back and forth to Mexico for several months at a time. He is a Mexican citizen in the United States on a work visa.

On May 7, 2019, the department filed a dependency petition on behalf of J.I. alleging her parents placed her at risk of harm by failing to adequately supervise and protect her from mother's substance abuse issues. (§ 300, subd. (b)). The petition also alleged father left her without provision for support (§ 300, subd. (g)) and that mother's

2

substance abuse previously placed mother's other children at risk of harm. (§ 300, subd. (j).)

San Bernardino County Superior Court Judge Erin K. Alexander held a detention hearing the next day. The judge found a prima facie case for detention and determined that J.I. needed to be detained from her parents. She ordered visitation for both parents two times a week for two hours, and authorized unsupervised visits for father as long as mother wasn't present.

B. *Jurisdiction/Disposition*

On May 23, 2019, the department filed a jurisdiction/disposition report which recommended the court find multiple allegations not true, including all the allegations under subdivisions (g) and (j) and the sole allegation against father under subdivision (b). Father once again told the department he didn't know about mother's drug use, and the department concluded the facts supported his denial. Father interacted appropriately with J.I. and provided for her needs during visits. He identified two potential caregivers and said he would take two weeks off work while they were cleared. The department recommended returning J.I. to his custody with in-home supervision.

On May 29, 2019, the judge held a jurisdiction and disposition hearing. She ordered a 29-day visit with father. However, when the department took J.I. to father's home for the visit they found three mice in the home, informed father it was not safe for J.I. to live in the home until the issue was resolved, and transported her back to her foster parents.

On June 4, 2019, the department submitted a Non-Appearance Review Packet. They explained the situation and requested the trial judge modify her order to allow unsupervised visitation once a week for two hours. They also requested to postpone the 29-day visit until the rodent problem was addressed.

On June 5, 2019, father moved in with his coworker Pedro V., his wife Martha V., and their son. Pedro and Martha had previously adopted a child in San Diego County and said they would be willing to house father and work with the department and father to care for J.I. J.I. moved in on June 17 with department approval.

On August 7, 2019, Martha contacted the department to inform them father intended to move back to his home in the barn at the ranch because he couldn't afford to pay rent and childcare costs. A social worker spoke to father, told him that neither the ranch nor the people on the property were approved, and advised him not to move. As of August 13, father and J.I. were still living with Martha and Pedro.

At the August 15, 2019 disposition hearing, the judge dismissed all the allegations against father. However, she found the remaining allegations against mother true and that the child fell under section 300, subdivision (b). Father asked that the ranch home be reassessed because he couldn't afford his current living situation. The judge ordered the home reassessed and other people on the property approved, but ordered father not return to the home until that process was completed and the home found satisfactory. She set a six-month review hearing for February 13, 2020.

The department assessed father's home, found it satisfactory, and recommended that father and J.I. be allowed to move back into the home. The judge adopted these recommendations on September 12, 2019.

*C. Subsequent Jurisdiction and Disposition Hearing*

On October 7, 2019, Martha contacted the department to inform them father left J.I. with her and she hadn't heard from him since October 1. She told the department father hadn't been sleeping at their home for more than a month. Nevertheless, she claimed father was supposed to be paying her $2,000 a month to live there and care for the child. On October 1 father paid them $500. She told father J.I. needed diapers and new bottles, and father said he would bring some. However as of October 7, Martha hadn't seen nor heard from father and was unable to contact him. A social worker attempted to contact father but was only able to leave a voicemail.

Later in the day on October 8 father showed up at Pedro and Martha's house. He dropped off new bottles and diapers but left again without saying where he was going or where he had been. The department and Martha attempted to contact father again, but as of October 15 those attempts were unsuccessful.

On October 17, 2019, the department filed a subsequent and supplemental dependency petition against father. The petition alleged that on October 1, father left J.I. with Martha without food, clothing, or arrangement for medical care, or provision for support, and she was therefore at risk of harm. (§ 300, subds. (b) and (g).) Finally, the department petitioned for more restrictive placement under section 387 on the basis the

5

previous disposition was not effective. The department recommended J.I. be placed with Martha and Pedro and remain in the department's custody.

Later that day the social worker was able to talk with father. Father was now in Los Angeles County and no longer had his job training horses. He didn't tell the department where he was living or provide any other information.

The trial judge held a detention hearing the next day with father present. He said he was residing in Lancaster, could care for J.I. at his new residence, and that there were people who could assist him with childcare. The judge found a prima facie case for detention, placed J.I. in the department's custody, and ordered she remain in Martha and Pedro's home.

The department had no further contact with father at the time it filed the jurisdiction/disposition report on November 1, 2019. The report laid out the efforts to contact father and explained he had not yet contacted the department to schedule visitation with his daughter.

The trial judge held the jurisdiction/disposition hearing on November 7, 2019. Father wasn't present and his whereabouts were unknown. The court found the allegations in the subsequent petition true, including the allegations under section 387. The court ordered reunification services and set a six-month review hearing for May 7, 2020.

*D. Six-Month Review Period*

The department filed the six-month review report on May 26, 2020. Father admitted he had poor communication with Martha. However, he explained he thought she was aware of the reasons for his absences and locations of the rodeos he was working because her husband and son worked for the same employer doing similar jobs. He thought she understood when and why he would be gone, and that when he was gone he was often out of communication because the job locations were "off the grid" with poor or no cell reception. Nevertheless, he admitted he should've better provided for J.I.'s care during his absences and communicated with his social worker about those absences.

The department reported that father demonstrated learned parenting and was consistent and affectionate with J.I. He also appeared to be bonding well and recognizing and understanding J.I.'s needs. J.I. would cry for long periods during visits, but father didn't lose his composure and was able to provide comfort. He participated in parenting classes and completed a portion of his case plan services. During one visit the social worker observed father calm J.I. by singing to her. The social worker also observed that he didn't overwhelm her with toys, that he listened and "talk[ed]" to her, and he generally gained and maintained her trust.

However, the department noted Martha was making it difficult for father to visit and maintain stable visitation. J.I. also appeared bonded with Martha.

The trial judge held a six-month review hearing on June 11, 2020. She ordered unsupervised visitation twice a week for four hours. She also ordered the department to

7

facilitate visits, due in part to father's counsel's representation that Martha "has been a constant issue in this case."

The department filed an additional information with the court on July 7, 2020. Visits were apparently going well, with father sharing photos of J.I. smiling and laughing. However, the report noted that Martha "continues to attempt to sabotage reunification and reports that the previous social worker promised she was going to adopt the child." For example, Martha contacted the department to express her opinion that father shouldn't be reunified with J.I. because he was undocumented, didn't have a driver's license, car registration, or auto insurance, and didn't have air conditioning in his home. She also refused to transport J.I. to further visits or to allow father to have overnight or weekend visits. In response father provided the department with copies of his driver's license, car registration, and auto insurance.

At the review hearing on July 9, 2020, the judge ordered weekend visits to begin as soon as all the adults in father's home were assessed and approved. She also ordered Martha "not to thwart those weekends," and told the department to arrange transportation if Martha continued to refuse to transport J.I.

On September 8, 2020, the department informed the court that father was under investigation for sexually assaulting his adult daughter whom he'd requested be assessed and approved as a possible caregiver. They also reported allegations that father had a methamphetamine substance abuse issue. The same day Pedro and Martha filed a de facto parent request.

8

At the six-month review hearing which took place on September 9 and October 26, 2020, father submitted on continued services and out-of-home placement, but objected to granting Pedro and Martha's request to be named de facto parents. Again, father raised Martha's interference with visitation, her false allegations against him, and that she acted against the court's orders. Nevertheless, the judge granted Pedro and Martha's request, continued reunification services for father, and maintained J.I. in out-of-home placement. In response to the allegations of substance abuse, the trial judge also ordered father to submit to random drug testing, starting with a test that day. She set a 12-month review hearing for January 7, 2021.

Father didn't drug test the day of the hearing as ordered. He did test negative on September 16 but missed two other drug tests on October 8 and October 20. Father alleged he misunderstood the drug test protocols, but also that car troubles prevented him from making the October 20 test. The department recommended he participate in substance abuse classes and continue random testing.

*E. Twelve-Month Review Period*

J.I. appeared bonded with father during the visits that occurred within the 12-month review period. She ran to him at the beginning of visits, and father was engaged and played with her in an age appropriate manner. Father brought a duffel bag of toys to every visit, with new toys each time, and didn't allow J.I. to become bored.

However, father struggled with being late to visits even after the department allowed another person to pick up J.I. and facilitate visits. At father's request, the pickup

and drop-off location for the visits was moved closer to father, but he still struggled with tardiness. The department eventually moved visits to its office in Victorville at father's request, and set at a time of father's choosing, and he was still over a half hour late to the first new visit.

The court held a 12-month review hearing on December 9, 2020. The court noted it had concerns about father's conduct and the likelihood of return, but that overall father was cooperative, had tried to stabilize his job and living arrangements, completed his case plan, and expressed a sincere desire to reunify. Therefore, the court continued reunification services—including mandatory substance abuse counseling and random drug testing—and set an 18-month review hearing for April 15, 2021.

*F. Eighteen-Month Review Period*

In their report filed on April 5, 2021, the department reported that during the relevant review period they had no contact with father and that he had not enrolled in substance abuse counseling or participated in drug testing as ordered. Martha told the department the last in-person visit between father and J.I. occurred on December 23, 2020, and father hadn't had any contact with Martha or J.I. since then. The department recommended the court terminate reunification services and set a hearing under section 366.26 to establish a permanent plan for Martha and Pedro to adopt J.I.

At the hearing on April 15, 2021, father objected to setting a 366.26 hearing. The trial judge observed that reunification appeared promising at the start of the dependency proceedings, but at this point father had been out of communication with both the

10

department and J.I. for several months. The judge was especially concerned about father's lack of contact with the department and the caregivers because of the ongoing issues around father's ability to provide stable housing and child care. Accordingly, the judge found there was not a substantial probability of return, set the section 366.26 hearing for August 12, 2021, and reduced father's visitation to once a month.

*G. Section 366.26 Hearing*

On August 3, 2021, the department filed a report in advance of the section 366.26 hearing. As of the report, date J.I. had lived with Martha and Pedro since October 15, 2019, just shy of two years—the vast majority of her life. They had all developed mutually positive relationships and attachments to each other. J.I. was doing well in Martha and Pedro's care, Martha and Pedro were cooperative with the department, and they expressed a desire to adopt J.I. should parental rights be terminated.

The judge set a contested hearing for October 4, 2021. Father testified. He said he visited J.I. four days prior but admitted his last visit before that was December 23—a gap of over nine months. Father said this gap was because he couldn't get ahold of the social worker or prior attorney during that time, despite trying to call and email. He further testified that his visits with J.I. went well and J.I. would usually happily play with him during the visits. Father requested the court adopt a lesser permanent plan than adoption due to their bond. Both counsel argued father was being disingenuous about not being able to contact people, since J.I. had been with the same family for nearly her entire life and father was in court a month before and didn't attempt to speak to anyone about

11

visitation then. Both counsel pointed out that J.I. was bonded to Martha and Pedro, had lived with them nearly her entire life, and that father's instability, lack of communication, and extended period of no visits meant he didn't meet the elements necessary to justify applying the beneficial parental bond exception to adoption.

The judge found it was likely J.I. would be adopted. She considered father's argument that the beneficial parental bond exception applied, but found father did not have regular visitation; J.I. didn't have a substantial positive, emotional attachment to him; and father had not proven that terminating parental rights would be detrimental to J.I. Specifically, the court stated "father has not had regular visitation. . . . [¶] As per [f]ather's own testimony he went most recently a period of nine months without seeing the child, and this is a young toddler who's only two-and-a-half-years old." On the issue of a positive emotional attachment, the judge said that by father's own testimony "at the last visit [J.I.] cried when the caregiver left showing that the primary attachment she has is with the caregiver. Again, a home to which she has lived almost her entire life." Finally, the judge said "if there was some detriment, and I don't find any has been shown . . . I'll note that there was a lapse in any type of contact between the father and the child for nine months, and there's no indication there was any detriment to the child." The judge terminated parental rights and ordered adoption as the permanent plan.

Father timely appealed the order terminating his parental rights.

ANALYSIS

Father argues it was error for the trial judge to determine that the beneficial parental relationship didn't apply, and therefore error to terminate his parental rights. We disagree and affirm.

Once dependency proceedings begin and a child is removed from their parents' custody, the state must provide reunification services and a judge must review the status of the case every six months for 18 months. (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248-249 (*Cynthia D.*).) If the child is not returned to the parents by the 18-month mark, the judge must terminate reunification services and set a hearing under section 366.26 "for the selection and implementation of a permanent plan." (*Id.* at p. 249.) "At that hearing, the court determines whether to terminate parental rights, making way for adoption, or to maintain parental rights and select another permanent plan." (*In re Caden C.* (2021) 11 Cal.5th 614, 625 (*Caden C.*).) "Adoption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*).) In order to avoid this outcome, the parent must show " 'that termination would be detrimental to the minor' due to any of certain specified circumstances." (*Cynthia D.*, at p. 249.)

One of these specified circumstances is if "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) This specified circumstance has "three

13

elements the parent must prove to establish the exception: (1) regular visitation and contact, and (2) a relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 631, italics omitted.)

"The first element—regular visitation and contact—is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) For the second element, courts may take into account "a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Ibid.*) As for the third element "in assessing whether termination would be detrimental, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Id.* at p. 632, italics omitted.) Courts must assume terminating parental rights will terminate the relationship between the parent and the child. (*Id.* at p. 633.) "What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Ibid.*) In assessing these elements, "courts should not look to whether the parent can provide a home for the child," as "[e]ven where it may never make sense to permit the child to live with the parent, termination may be detrimental." (*Id.* at p. 634.)

In reviewing a trial court's findings on these three elements, "a substantial evidence standard of review applies to the first two elements." (*Caden C.*, *supra*, 11 Cal.5th at p. 639.) "On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.)[1]

We find that substantial evidence supports the trial court's determination that father did not prove the first element required to apply the beneficial parental relationship exception. J.I. was almost exactly 29 months old at the time the trial court terminated father's parental rights. For over nine of those months—just under a third of J.I.'s life—father didn't visit her at all. Moreover, this period of absence came at the end of dependency proceedings, *after* father had received reunification services. This alone is sufficient evidence to conclude father did not have regular visitation or contact with J.I. Indeed, the trial judge indicated this fact alone was dispositive, concluding "father has not had regular visitation," because he went "a period of nine months without seeing the child," who was only two-and-a-half years old at the time. However, in addition to the extended absence at the end of the case, there were other periods where father missed visits or went quiet throughout the life of the case. For instance, father delayed in setting

---

[1] The third element is subject to a hybrid standard of review where questions of fact are subject to a substantial evidence standard but the final determination is subject to an abuse of discretion standard. (*Caden C.*, *supra*, 11 Cal.5th at pp. 640-641.) Because we conclude the court's decision on the first element was supported by substantial evidence, we needn't and don't address the third element or its standard of review in depth.

up visitation in October and November 2019 and missed visits due to his tardiness in October and November 2020.

Father argues any inconsistency should be discounted because the record demonstrates Martha intentionally attempted to thwart visitation. It is true that Martha was apparently a major impediment to visitation early in the case's life. However, the record contains no evidence that Martha remained a problem after the July 9, 2020 six-month review hearing when the judge ordered Martha to not interfere with visitation and ordered the department to facilitate visitation. Indeed, after that point the record indicates father's tardiness, not Martha's obstreperousness, presented the biggest obstacle to his visits.

Even if we were inclined to agree with father that his struggles with Martha and with contacting the department entitled him to some leeway, the substantial evidence standard of review doesn't permit us to substitute our view of the evidence. Ultimately, father failed to convince the trial judge that the nine-month gap in visitation was excusable or explainable, and the judge made the factual determination that father's visitation was not consistent enough to merit applying the beneficial parental relationship exception. The nine-month gap in visitation was sufficient evidence to support that factual determination, and we are therefore bound by it.

Because substantial evidence supported the trial court's determination that father failed to prove the first element required to apply the beneficial parental relationship exception to terminating parental rights, we need not address the other elements of the

16

exception. We therefore conclude the trial court properly declined to apply the exception and affirm its decision to terminate parental rights.

## III

## DISPOSITION

We affirm the order terminating father's parental rights.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH _____
J.

We concur:


McKINSTER _____
Acting P. J.


FIELDS _____
J.

17